This case, I guess, well... Would you pull the mic up so the judge can be sure to hear you and speak up? Thank you. I think that in this case we have two problems, whether or not there was a ballot consent, and number two, whether or not the officers were entitled to seize the firearm in this particular case at the end of the day. Just so we get it clear, to frame the issue, there were two counts. One was the Derringer and one was the... It's a 9mm, I believe, of some kind. Makarov, right. Okay, so the Derringer count was dismissed? Yes, sir. But that was the gun that was allegedly in plain view? Exactly. Okay, so the focus is on whether the seizure and discovery of the 9mm was proper. Right, and so in this particular case, Your Honor, there is absolutely not one word of testimony about how the 9mm, where it was, when it was discovered. There's not even one word about that particular firearm in the suppression hearing period. And all that we focused on, I mean, what was focused on in the brief was the weapon that was seized, at least that we know that was seized and was spoken about at the suppression hearing, which was the Derringer. But I frankly have no... Could we clarify what you just said? Because in the hearing where the court, I'm looking at the excerpt of Record 34, the court adverts to the trespassing arrest, and then he said, we took the one bag that had the guns in it and a scale, and we placed that into evidence. And the court says, okay, and the bag was taken from the car pursuant to the consent of the search. That's at 34. Then it comes back, and the court is talking at ER 39, and he's talking about that Nevada statute, and he said, what was found was pursuant to consent. It was in plain view. Once that consent was given, then the gun was in plain view, at least as to count two in this indictment. I'm not so sure about count one. Apparently, that gun may not have been in plain view. And then he says, it appears to me they had the lawful right to take that into custody at that point, along with the defendant. That's what he says at that point. And then at ER 46, he says that within a reasonable period of time, the defendant did give consent to the search at the scene. Pursuant to that consent, the bag was secured, it was opened, and it was only after it was opened that the defendant withdrew his consent. At that point, the gun, which is the subject of count two, was in plain view. Now, that's what I could find in the record about the 9-millimeter. I think that's accurate, Your Honor. I don't think there is any other testimony. I mean, in fact, there was no description of where the 9-millimeter came from, what bag or not. We don't have any clue at all because the only apparent item that the officer could see when he appeared in the bag, at least according to his testimony, was the silver part of the derringer. But, I mean, even if that's true, the problem is, is that at that point, and it's at the point that he seizes that that we have to focus on in terms of whether or not the government can seize that particular item without a violation of the Fourth Amendment, is whether or not it was obvious to him at the time it was contraband, and it couldn't be. Because, number one, there's no prohibition in Nevada for carrying a firearm in a vehicle, unlike some other States. And, number two, he did not have any information at that time that Mr. Hale was a prohibited person and was not allowed to have that weapon. But what if the, I mean, are you challenging that they didn't have cause to seize the bag with the derringer in it? They can seize the bag, Judge, but they can't, well, I mean, I guess they can seize to look at it, but the bag itself is not evidence. There was a drug investigation, you know, aside from the project. Well, they took the bag into custody, all right? So then what happens to the bag? Are they disabled from looking into the bag further until they get a warrant? Well, I believe they are. I mean, if they can even take the bag to begin with, I mean, they can inspect certain things, but unless they have probable cause under the Fourth Amendment, they're not entitled to seize that particular effect. I mean, they can find it on the street. They can't seize it. They still require, the Fourth Amendment requires probable cause not only for the search, but for the seizure of the evidence. And in this case, there was no probable cause whatsoever, period. I mean, and that's, and I'm arguing this in reverse, and we can talk about the fact of whether or not there was any consent. And again, according to the factors that this Court analyzes and looks at under the totality of circumstances, none were presented. This was a verbal consent. There were no written forms in this particular case, and the two officers that allegedly got this verbal consent were not produced by the government as witnesses. We had a third party, the detective that was evidently there doing this narcotics investigation, was the one that testified, but he testified that it was not him that gained the consent from Mr. Hale, and either time were two other officers, Officer Shoemaker or Schmucker and Yonkers. Neither one of those gentlemen testified. So none of the factual underpinnings that we need or the district court needed to determine whether or not that consent was valid or absent from the record. Secondly, the judge found that once consent, and apparently once consent is given, then you can't withdraw that consent, or even assuming there was any consent at all. Because the detective, when the bag was removed, one of the officers opened it and put it on the ground or on the back of the vehicle, and I would assume that was the purpose of that was so the dog could come and sniff. They got a canine dog down there. The dog alerted on nothing. It wasn't until later that the detective that was talking with Mr. Hale later went after he'd removed his consent and then looked in it, and that's when the judge found it was in plain view. Now I'm confused. The judge found that he saw the Derringer, the chrome handle, and it was at that point that the consent was withdrawn. I believe it's my understanding, Your Honor, that when the bags were removed out and he withdrew his consent before the detective actually looked in the bag, another officer had already looked in there and seen nothing, or at least he'd opened it for the dog to sniff and didn't notice anything. It wasn't until subsequent to the revocation of the consent that he actually said he saw the Derringer and dismissed count. But, I mean, just to make this, I mean, I guess I'm making it a little overly complicated because it really doesn't matter in this case because we have no evidence whatsoever about the 9-millimeter, which is the count of conviction. And I would reserve the rest of my time unless the court or Judge Gibson has a question. Judge Gibson, do you have any questions? The only question I have, as I understand, the officer that testified was Detective, I cannot pronounce his name, he begins with a K, and he testified. He was asked, did you get permission to search? And he said, Officer Chip Yonker did. Were you present when that permission was granted? Yes. I was talking with Mr. Hale when this occurred. So at least Officer or the Detective was present when the consent was given. I believe that is true, Judge Gibson, yes. But he didn't give, I mean, it's hard for him to say all that's in the record is his consent was given by this other guy. But that, in a verbal situation, doesn't give us any of the surrounding factors that are part of the government's burden of proof. Okay. All right. You can have the rest of your time. Good morning, Your Honors. Ron Rasho from the U.S. Attorney's Office in Reno. Good morning. We haven't seen you since yesterday. Uncooperative, that's right. We haven't seen you since yesterday. You've got an uncooperative mic there. Once again, another search and seizure issue. In this particular case, in the court early on, Judge Fischer, you pointed out to what Judge McKibben's findings were. What I think is of interest in this particular case on the issue of consent initially is really the defense did not argue that there was not valid consent to search. At the trial court, they more or less conceded that there was consent and then tried to ride the horse that consent was withdrawn before the officers saw anything. Officer Kazumchik was the only officer that testified, and there are obviously at least two other officers present. At some time, another officer, Chip Yonker, an officer, showed up with a narcotics detection dog. But there is no testimony really concerning the consent to search, other than Officer Kazumchik saying that Officer Yonker got permission to search, consent to search, in his presence. Defense never really contested that. What they said was that the permission was withdrawn, and the facts are in the record that the defendant did withdraw his consent at some point.  Counsel makes the point that with respect to the 9-millimeter, there's virtually no evidence with respect to it and how it came in lawfully to the possession of the government, and that's the crime of conviction. That's an interesting issue because there is no mention of the 9-millimeter except in count one of the indictment and then the plea. And I suppose in retrospect, the plea should have been to count two rather than count one, and then we maybe wouldn't be going down this road. And I look at that. That's why we have appeals for interesting questions. And I'm sitting here saying, they're going to ask me about this, and I'm going to say, well, in the record, we look at the indictment, count one, there's the 9-millimeter. We look at the change of plea. We look at the judgment of conviction. But where is it in the transcript of the suppression hearing? I think the answer to that is the gun came out of the bag because the bag was the only thing that was seized. And Officer Kuzuncic testified that he could see a gun, at least the Derringer itself. That was clearly the Derringer because that had the chrome on it, and he said it was the Derringer. Correct. He could see the Derringer, and there's no evidence that anyone could see anything else until they searched that bag, and this would have been after consent was withdrawn. So the question becomes, if they lawfully seized the bag, which Judge McKibben found, and I think that they can under the circumstances where they see a handgun like this, they can take the container it's in. They're going to arrest the defendant. Well, let's suppose they saw the handgun, took the containers in. Are they then allowed to rummage through the bag without getting a warrant? The bag has no probable cause on the bag. As far as doing a search on the scene, correct. But if they're arresting the individual, it's a search incident to an arrest on which you can search the immediately surrounding areas. But there's no evidence in the record when this bag was searched and the gun was found. That's true. But the court held that the gun was in plain view. The gun in the bag was in plain view at the record 46. The Derringer was in plain view, Judge Gibson. The 9mm was not in plain view. There's nothing in the record to show that the 9mm was found at the scene and not later. As the record reflects, no one knew who the defendant was. He gave a false name of Jude Johnson so that when the police ran him, it came back clean. So he's lying to the police about his identity, and now he's trying to bootstrap on the fact that since they didn't know who he is, they couldn't arrest him or it was a misdemeanor arrest or whatnot. The facts are that there was a citizen's arrest made. The officers executed that arrest. At some time, the gun was found. That was a question I had. It's based on a citizen's arrest, and a citizen's arrest does it have to be a probable cause to do it?  There has to be reasonableness on the part of the citizen. The officer has to in some way determine himself whether it appears to be valid. In this case, as Officer Kuzumchak testified, he did some investigation on his own before he actually executed the warrant. But the officer himself, I believe, has a duty to take the person into custody if a responsible citizen signs the warrant. I think the officer is acting in good faith at that point based upon representations of what appears to be an honest citizen. I guess I'm really not that familiar with a citizen's arrest for the basis of an officer taking somebody into custody. It seems like that's kind of a loophole. The officer doesn't really have to have probable cause. Was there a signed warrant? Is that what there was? It was my understanding, the way I read the record, that the manager of the motel actually signed a complaint form to execute the citizen's arrest. Okay. Is that a complaint form? And what was the nature of the complaint? I believe it was for trespasser loitering, Your Honor. Yeah, that's what I was thinking. So is that enough to take a person into custody? Pardon me? Is that enough to take a person into custody with a complaint form for trespassing? I think the answer to that is yes, Your Honor. A police officer can't arrest for a misdemeanor unless it occurs in his presence. But if a citizen signs out a complaint, then they can arrest based on that. They may have the discretion to cite or arrest, but I don't think the arrest is illegal once the citizen has signed a complaint, that the officer is acting in good faith, assuming they've made at least some preliminary good faith inquiries, as happened here. So we get back to the fact that Officer Kucinichek had a signed complaint, but he also had some evidence based upon a brown bag in the testimony of the manager that there may have been drug dealing afoot and that the manager had kicked Mr. Hale out three or four days before and he was back again. They start to do a search, consents withdrawn. They seize the bag. The bag is already out of the car. The defendant is going to be arrested. The car is apparently in a place where the owner could have it removed. What are the officers to do when they see a handgun there? They've got a duty if they're arresting someone to safeguard the individual's property. They've got a duty, if they're going to safeguard, to go ahead and inventory it. In this particular case, they took the bag because the gun was in it. They apparently eventually found the 9mm in there. What do they do with the record that sort of now gets into speculation? That's where we are. I can't quibble with that. The record is relatively brief. We look at the five factors for consent. Nobody went into them. For all practical purposes, they just sort of conceded it was consent, and then the issue became whether the consent was withdrawn and when, and what could the officers do at that point. So I suspect that everyone agrees there was initial consent. It was apparent Mr. Hale was aware of his rights because he withdrew his consent when they started to focus in. If the bag is open and if the gun was there, in plain view, it's a finding of fact which the court found is not clearly erroneous. So that may be true up to the Derringer. Up to the Derringer. Well, you said something a minute ago about the 9mm being found in the search. I thought you said in the search of the bag just a few minutes ago. Am I in error? No, you're correct, Judge Gibson. I said it. But as Judge Fisher pointed out, we're in the area of speculation here. It's not in the record. And since that was the only thing the record indicates was seized, I leap to that assumption if you wish. Was there any argument that it would be an inevitable discovery of the Derringer if he was lawfully arrested and there would then be an inventory search of whatever he had with him? I think inevitable discovery eventually comes down the road, that if they're arresting the individual and hauling him off, but it's going to depend, and once again, the record's devoid of what happened, but whether they're taking the car into custody along with everything else with which they'd have a dutied inventory. As far as inevitable discovery as part of the search, it was several days before they really found out who he was. By that time, he'd already been released on the local charges and they were out hunting for him again. That's why I jumped to the assumption that the 9mm came out of the bag because they still had it in evidence. But he was arrested, right? He was arrested. Wouldn't that justify a search of things that he had with him? It's a search incident to arrest with anything that would have been immediately within his, under the Schimel theory, which I believe extends to anywhere in a car, and we're back in law school, Judge, and I'm trying to remember Schimel. Yeah, all right. But it's something within reach and reasonable, and I believe under a car and the mobility of the car, if you've got PC or if it's a search incident to arrest, you can do it. All right. Well, we've had an interesting legal exam on hypothetical facts. Thank you very much for your argument, and we'll hear from the counsel for the defendant. I think, coming back to this, pal, even if they could legitimately search it doesn't mean they can seize it. They have to have probable cause, and that's what Sotal says, cited in our brief. Plain view has two things. They have to see it. They have to be there where they can see it. And the second thing is that the incriminating nature of the thing has to be immediately apparent. Now, when you're arresting somebody for trespassing, unless there's a statute in the matter that I'm not aware of that's trespassing while armed, that's not – there is no – So what should they have done with the bag? Put it back in the trunk where they took it from. And then do what with the car? Well, they could leave the car there. They didn't impound the car. We're now even getting further into speculation, ultimate discovery, inventory searches. None of that happened. The car stayed there as far as anybody knows. But he did consent to having the bag removed. Right. And so then if they find no evidence, Judge, then I think they need to put it back in the trunk, if they're going to take him away and not allow him to do that himself. The trunk was locked. What's the basis for that, to have to put it back in the trunk? Well, I mean, either that or just, I mean, leave it out in the street where they put it. I mean, he consented for them to look at it. I don't believe the consent allowed them to carry it all over the parking lot and put it wherever they wanted. They can look at it if you assumed it was missing. Carry it with him to the police station. Well, why should he do that? I mean, you know, they're the ones that took that. I mean, if you would have given some choice, I'm sure he would have put it back in the trunk. I don't think so. But, I mean, really. I mean, the thing is, is that we're down here now talking about, you know, inevitable discovery. But the thing is, it's not in plain view if it's not immediately incriminating. And you don't think it's relevant to the potential drug dealing? There was no drug deals there at all, Judge. I mean, the dog came. He didn't find any drugs. There's nothing on Mr. Hale whatsoever. There's nothing in the car. There's no drugs. Didn't the proprietor there make some statement about the fact that, I mean, the man had been trespassing? And that was his big complaint. But on the other hand, didn't he make some statement about the fact that there had been a lot of drug dealing around the area? Well, in that particular part of Reno, that's pretty much every day. They're trying to clean that up now. But that's not, I mean, that's what happens at that particular place in Reno. But I don't believe that that was linked to this particular person. And even if it was, the discussion plus the drugs or the dog dispelled all the suspicion of any drug dealing, period. Okay. All right. Thank you for the argument by both counsel. The case just argued is submitted, and we'll proceed to the third case on calendar. Just for planning purposes, we will hear argument on Pappenberg, which is coming up, then Humphrey, and then the court will take a brief recess. Good morning, Your Honors. My name is John Johnson. I'm appearing on behalf of the appellant, Judith Pappenberg. You've gotten a real education in Fourth Amendment today, having to wait for your argument. That's right. This is different here. I'd like to reserve three minutes for rebuttal here. All right. Please watch the clock, though, because I'll try and help you out. Okay. We believe that the issues are whether the administrative law judge made adequate findings and whether he failed to fully and fairly develop the record. The district court noted that both parties agreed that based upon the medical evidence of appellant's sinus surgery in 1988 that hemorrhaged into her brain, the medicines met the disability standards 12.02A for organic brains to no damage. The dispute really centers on the B criteria, severity of functional limitations, and we believe that there are two errors in this regard. The first is that the administrative law judge set forth no explanation for his B part findings. This is an error under the Schneider case. Significantly also, number two, the administrative law judge made no findings whatsoever with regards to her chronic inflammatory sinusitis that caused daily headaches at any of the stages, and we contend that he should have made such a finding and then considered in combination with her mental impairment, her organic brains to no damage, and her short-term memory loss in making those B part findings. This is the Lester-Marsha error. Also, the administrative law judge rejected all of the medical evidence from her treating physicians. This is Dr. McKinney, who stated in December of 1993 that she had been apparently suffering from a deterioration in her dementia, and he had referred her, cascading from her sinus surgery, and he referred her to Dr. Burke. And the administrative law judge also rejected the two assessment forms from her internal medicine doctor. This is Dr. Youngs, who also indicated that he thought that her condition was progressively deteriorating. The judge said in both cases that he felt that the medicals did not support their opinions and that they were in conflict with the report devised by a psychologist, Dr. Padel, as well as a neurologist, Dr. Slavin. We have contended, argue, that there was no real conflict because Dr. Padel mentioned that he only considered her limitations from a strictly intellectual point of view, that she still had the capacity to perform simple elemental tasks on a consistent and reliable basis. Dr. Padel did not consider chronic headaches from the inflammation. Dr. Slavin, the neurologist, said that her symptoms were subjective. Some memory loss here. Again, he did not consider the chronic headaches. Significantly, at the close of the hearing, the judge says that he was willing to grant the appellant's claim at the date that she turned age 50, which is by operational law and the medical vocational guidelines. He said, if you want something more, if you want me to basically establish eligibility, determine onset date, I need something more. We had a big discussion about this, and I said, all right, Your Honor. I will obtain the results of battery psychological tests, basically the Lurie, Nebraska test for organic brain signal damage, and I'll send her out to a neurologist here. The judge said that was acceptable. I obtained those results. I submitted them to the judge. The judge rejected both of those consultants' reports on the grounds they were not supported by the evidence. But specifically, he said that Dr. McDonald's psychological assessment did not indicate any functional limitations or when they may have occurred. As to Dr. Fornes, he says that that was not really his description of inability to perform sustained work activity, six to eight hours, was inconsistent with the evidence of record, specifically Dr. Padel's assessment, that says she could work on a reliable and consistent basis here. But help me if I got the sequence of the doctors a little bit better in my mind, for example. McKinney is the first doctor that she saw, and that's primary care doctor? That's correct, Your Honor. And then he referred her to Dr. Burke. Bruce Burke, yes. Who would also be a treating doctor, I gather? Had been. He was the one that repaired the damage after the sinus surgery. He didn't do the sinus surgery. After there was the hemorrhage into the brain here, he's the one that basically repaired the damage and tried to follow her condition for a while. So he was treating really, in effect, also because he was repairing the damage, right? He was really the surgeon that had repaired the damage, and he followed her to a sinus for a while until he felt that there was basically nothing more that could be done. And then when did Dr. Youngs get into the picture? Dr. Youngs has always been her family doctor, and I've been seeing her basically forever and ever. She was at a clinic up in Berry Creek, and he treated for colds and her aches and pains and her arthritis in her back. I thought that was Dr. McKinney. No. Well, Dr. McKinney was one of her treating physicians. She had several, but the clinic lived up in Berry Creek, and so the closest clinic was actually the Berry Creek Clinic, and that's where Dr. Youngs worked. Dr. Youngs, okay. Yes. to have her examined. That was after she was 50, I guess, then. That was after she turned age 50. That was at the end of the hearing, and it was really at that time here. They were just strictly consultants because the judge said he needed something more. And what we're arguing here is that because the ALJ rejected the reports by Dr. McKinney that said she's unemployable, increasing dementia, Dr. Youngs, and the consultants' reports, there's a fundamental ambiguity in the case here, which is basically she was found to be disabled as a matter of operation of law rather than based upon the medical evidence here. It still stands that the judge said, as the district pointed out, it could have always been said that she's always been disabled or she's never been disabled. No one really knows when the onset date of disability began here. One of the things that's a little unclear to me, I mean, the focus, you're making the focus on the chronic sinusitis as one of your two errors. And as I went through the ALJ's review of the evidence and the second hearing, because there was a second ALJ on this remand, right? Yes, sir. Where was the focus in the presentation on your part of the because I look at Forerner and McDonald, are they focusing on the headaches or are they focusing on something, sort of the effect of the headaches? It's a little unclear to me how the headaches play into it. If somebody says, I've got such a severe headache, I can't work, whether it affects my memory or not, I've got these severe splitting headaches, and I can't go to work. Is that the nature of the claim and evidence, or is it somehow just sort of morphs into this mental impairment? Really, it goes to the last issue. No, Dr. Forerner was a neurologist, and he just really considered the effects of the organic brain syndrome damage. He didn't really consider headaches at all or the sinusitis, and neither did Dr. McDonald. That was really a specialized test, a Lerner-Braskett test, to determine organic brain syndrome damage, the level of that. It wasn't really to have anything to do with that. What do you say the evidence is on the chronic sinusitis that was there that wasn't properly considered? Well, there was the results of the November 1993 CT scan that said she suffered from encephalomyelagia and brain atrophy and also chronic inflammatory sinusitis. And she was always reporting that she had headaches. There was records from the Orville Hospital that she was reporting headaches all the time. And where we consider this really comes into play here is that the judge, again, made no findings on that, that she had sinusitis or the effects of that. And when he determined her functional capacity, he said, besides her exertional limitations, that she basically only had one non-exertional limitation, and that was a restriction because of her mental impairments, a restriction to the capacity to perform simple, routine, repetitive work. When he presented his hypothetical questions to the vocational expert, he listed only two non-exertional limitations, and that was inability to use a keyboard, a typewriter, and restriction to being able to perform simple, routine work. Whereas the state agency doctor, Dr. Golop, who also didn't consider the headaches and all that, he said that in addition to a moderate limitation with regards to inability to understand detailed job instructions, he also said that she was moderately limited in the ability to concentrate on an extended period of time here, and she was also unable to respond appropriately to routine work settings. We contend that there was two errors here, that in the hypothetical questions presented to the vocational expert, who testified that she was able to do two kinds of seven-day jobs, not sorter and surveillance system monitor. First, he did not, the ALJ basically excluded any consideration of pain. It was just not, he did not even focus on that at all here. That is a non-exertional limitation. This court has held in every case if there's evidence of pain, whatever that source might be here, that the pain limitation must be included in the hypothetical to the vocational expert. Otherwise, the vocational expert's testimony is not reliable, cannot constitute substantial evidence. We also contend that V.E.'s testimony was also unreliable because the ALJ did not include those two additional functional limitations in the hypotheticals to the vocational expert. Okay. Why don't you save the rest of your short amount of time. Good morning. My name is Mark Winn, appearing before Kelly and Joanne Barnhart. Substantial evidence does support the ALJ's decision that the claimant was disabled due to age in September 1997, but not before. In response to the headaches... Could I ask a question before we get there because your opponent closed with it? What about the exclusion of the limitations caused by pain? The ALJ, in fact, very substantially evaluated credibility in his ALJ decision, and having adequately treated the subjective complaints in that credibility evaluation, he was under no obligation to include those in any assessment of his or her ability to work. The pain was fully addressed in his ALJ decision, and there's no reason to put those in the hypothetical question. Well, where does he fully evaluate that? All he says, I have considered the claimant's allegations of excess pain, and that's all he says. There's no address in this ALJ opinion where he addresses chronic sinusitis and the headaches. We're talking first about the question about excessive pain. Well, but isn't that supposedly what brought the headaches are the pain, aren't they? Yes, but as far as the symptoms... Was there pain from something else, or maybe I'm misreading this? It's pain from any source, in fact. Well, I understand. But in this case, he states that the issue before it, I think I may have had the same question Judge Gibson did. She says she alleged disability due to headaches and a limited short-term memory. That's what he says at page 3 of his opinion. And then the only thing I can infer that he's addressing with respect to the headaches is the excess pain. Pain was due to headaches. Also, there was an allegation of back pain as well in this case. So where is the detailed analysis that says he's addressed the pain from headaches? Maybe it's there. I just couldn't find it. Yeah, it's the fact that the first dose of conservative treatment, the treatment notes from the... Now, where does the ALJ, are you pointing to the record? Could you... Yeah, page 291 of the transcript, in fact. That would be page 8 of his decision. All right. And at least number 5 first. Well, first, the weight of the objective evidence does not support the claimant's claims of disabling limitations. And as to that, we have the January 18, 1994, Dr. Burke examination, who found essentially normal neurological examination. And what claimant told Dr. Burke at that time was that her headaches were about the same as they were four years prior, which would be 1990. And what's significant is at that time, claimant was, in fact, working rebuilding oxygen regulators, and she continued to work thereafter until 1993. And the district court even said at that point that many persons do have headaches and still are able to continue working. And that's borne out by claimant's actual work activity since those headaches began. Yeah, but it's headaches in combination with a whole lot of other things. And those were all evaluated as well. The main — Those were all what? Those were also evaluated in addition to the headaches as well, in combination. But that's the key, is in combination. It didn't seem like, you know, for example, in the hypothetical, that wasn't illustrated as being one of the things, the vocational expert. Well, claimant's asserting that Dr. Golub, the State agency physician who reviewed the whole record, didn't consider the headaches, but he, in fact, did cite the report of Dr. Burke, who did evaluate the headaches, and said they hadn't changed since four years. What does Dr. Burke say? Well, Dr. Burke says — that's on page 152 of the transcript. And I'm looking just to the paragraph in the middle where, just before the objective, it says, the patient states that her headaches are about the same now as they were four years ago. And this report states — At what time is he examining her? January 1994. So four years prior would be January 1990. And that's the time when, as it says in the beginning, she was working with oxygen regulators. And since that time, she also worked as a home health aide or as a sewing machine operator and as a certified nurse's aide up until that date. One of the reasons why I was asking about the various doctors is because there is a special deference that's given to the treating physicians. And we have McKinney and Dr. Youngs who are both clearly treating physicians. Now, how about Dr. Burke? He did the surgery, but did he do anything else other than just examine her? We only have these, as far as I know, two reports from him. And he did examine her at this point, but he doesn't give any specific limitations. He does say that her neurological examination is essentially normal, except for some slight slow indentation and some memory loss. And the memory loss was the main thrust in this argument, in this claim at first. And the ALJ — even though an ALJ's — even though a treating physician is normally given deference, an ALJ may reject a treating physician opinion by citing forth specific legitimate reasons. It's hard to see how a person would really be hired that has all these problems with memory loss, can't sit and stand for very much of the time, and has continual headaches. If you were an employer, would you really be wanting to employ somebody that has those limitations? But, Your Honor, that's not the standard by the regulations and the rules. And to address this issue, we actually had a — It's a nutsorter. As far as I know, it's contained in the DOT, the dictionary of occupational titles. What do you do when you're — where do you sort these nuts? According to the vocational testimony, apparently you just — as nuts go by, you sort bad nuts from good nuts, as far as I can tell. And — Where? Nuts from Fresno or wherever may happen to — I see that. There's a job. And we do rely on the testimony of the vocational expert in these situations. Well, I know, but I guess we're — vocational experts are experts, I suppose, but don't they have to show what kind of a job it is? I see that there are a lot of people apparently — employed as a nutsorter, in fact. As a nutsorter. I just was curious if you know where they do this sorting of nuts. I'm not certain, but the vocational expert, we're relying on his testimony. Who does know these things? Nobody asked that question, huh? Neither the claims attorney or ALJ asked that question. How about the surveillance monitor? What is that? Apparently, you watch a monitor. Monitoring what? Monitoring what's happening in perhaps a building, after hours, security. Like a watchman? I would think so, from the description that the vocational expert gave. And that's a job where you can sit down and stand whenever you feel like it, according to the vocational expert testimony. And you don't have to have a good short-term memory, like who just came by, whether if you're watching to surveil this building and you don't remember whether somebody just came by or not? The evidence doesn't show that there's that much in the way of limitations. In fact, the ALJ was basically relying on the decision or the report of Dr. Podell, who was a licensed psychologist, who definitely and specifically treated or evaluated the memory impairment. Did he consider the headache, the effect of the headaches, in addition? The headaches were not specifically discussed there or alleged by the claimant herself at that point. But she did also, as a psychologist, evaluate her mental condition and said there was no behavior or problems that would manifest themselves or would limit her ability to do simple work. I know I see these case after case with the vocational expert being wheeled in and says there's this, this, and this, and without practically thinking how that's going to work, like you take that surveillance monitor, somebody is legitimately going to be hired that has a short-term memory, has headaches a lot of the time, can't sit and stand to follow somebody to see where they're going. I can't imagine how that person is really ever going to be hired as a surveillance monitor. Well, the statute of the rules say that it's not the employability, which is the factor. The factor is whether the claimant has the ability to do these, has the exertional capability to do these jobs. Well, that's what an employer would be considering, whether the person can actually do the job. Yeah, but physically employability as a factor is not a factor in this case, by Congress, congressional mandate. Yes, okay. You're not trying to suggest they overwrite us. Well, I wouldn't do that. But you are, and you may be right. All right. Your time is up. We'll give you a minute on rebuttal. Judge Gibson, before I go, did you have any questions? No, no. Thank you. I just thought I'd point out that in Dr. Burke's report of January 18, 1994, here's page 152 as referred to here, the claimant reported that she had constant daily headaches that involved the right frontal and occipital region, especially when she bends over, throbbing sensation. And Dr. Burke did mention that that was one of the diagnoses here, chronic daily headaches, sphenoid and ethnoid sinusitis. What was the evidence in the record that you're saying showed the effect on her performance? I mean, the government is arguing that, sure, she had the headaches, but they were there all along and she's been able to function. So what's new? Okay. Well, it goes to the state agency's evaluation. This is Dr. Golub's assessment. He said it could be just because it's short-term memory loss here, but maybe it's because of the headache pain. He said that she had a moderate limitation with regards to the ability to concentrate for extended periods of time. That was what he indicated, as well as inability to respond to change of work settings here. That was what was left out of the hypothetical to the vocational expert. I want to point out that there was no specific finding in the credibility finding with regard to headache pain. She had alleged two kinds of pain, the back pain and headache pain. The judge basically went into a lot of different reasons, but he never really identified what pain he was talking about, whether it was the back pain or the pain in the headache pain here. Which would be the treating physicians to whom deference is due? We would argue that deference should be given to the opinion of Dr. McKinney, maybe not so much with regards to Dr. Young's. He's not a specialist and his reports were just assessments. He did not write an evaluation. But Dr. McKinney was very concerned about the case. He said that she was suffering from serious complications from a sinus surgery. It was in the notes that was recorded, actually, by Dr. Burke, where Dr. Burke said that Dr. McKinney had referred her to us because of increasing dementia. It was Dr. McKinney that was really concerned about her case and referred her back to the neurologist. Dr. Young didn't do that for some reason here, but Dr. McKinney was really concerned. It was that report. We consult Dr. Burke. Dr. Burke didn't really say much. He just said she has some brain damage, she has brain atrophy or encephalomyelitis. Do deference as a treating physician? Yes, but he just didn't make a determination of disability. He didn't offer any opinions as to whether she could or could not work. He didn't say what her functional limitations were. I mean, he just basically thought that her condition had been stabilized and there's nothing for him to do as a surgeon, and then he was just out of the picture. He just didn't offer an opinion. What I want to point out with regards to sustained memory. You'll have to be quick because we're well over your time. Okay. The claimant had testified that she stopped her work as a nurse's aide because she said she couldn't remember her patients, couldn't remember what rooms they were in, she couldn't remember what she was supposed to do for them. She has some serious memory problems here. And we contend that because of the fundamental ambiguities here, that the commissioner should be found to have failed to meet their burden of proof. Step number five here, there was insufficient factual basis for reliance upon the grids, and that is also error.  Thank you. All right, thank you. Counsel is thanked for their argument. The case that's argued will be submitted.
judges: Hug, Gibson, Fisher